# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO: 20-11986** |
| | § | |
| **DENNIS A PERRY,** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR.** | § | **SECTION A** |
| | § | |

---

| | | |
|---|---|---|
| **PERRY ASSOCIATES, LLC; CRESCENT CITY PROPERTY REDEVELOPMENT ASSOCIATION, LLC; CRESCENT CITY MEDICAL SERVICES, INC.; PRIVATE CONNECTION AUTO, LLC; 4330 STATE STREET DRIVE, LLC; & 1100 SOUTH JEFFERSON DAVIS PARKWAY, LLC,** | § § § § § § § § § § | **ADV. NO. 21-1002** |
| **PLAINTIFFS,** | § § | |
| **V.** | § § | |
| **DENNIS A PERRY & DEALS ON WHEELS, LLC,** | § § § | |
| **DEFENDANTS.** | § § | |

---

| | | |
|---|---|---|
| **DENNIS PERRY,** | § § | |
| **PLAINTIFF,** | § § | **ADV. NO. 21-1024** |
| **V.** | § § | |
| **DARRYL FISH,** | § § | |
| **DEFENDANT.** | § | |

## MEMORANDUM OPINION AND ORDER

The parties to the numerous contested matters filed in the above-captioned bankruptcy

case, as well as the claims and counterclaims asserted in the two above-captioned adversary

proceedings, agreed to bifurcate the resolution of those disputes between liability and damages. After a four-day trial on the merits of all of the disputes, this Court issued an *Amended and Superseding Memorandum Opinion and Order* detailing the history and timeline of events occurring among the parties and memorializing the Court's findings of liability (the "Liability Opinion"). [No. 20-11986, ECF Doc. 433; Adv. No. 21-1002, ECF Doc. 177; Adv. No. 21-1024, ECF Doc. 94].[1]

For the reasons memorialized in the Liability Opinion, this Court sustained claim objections filed by Dennis Perry and disallowed the following Proofs of Claim filed against the estate in Perry's bankruptcy case:  (i) Proof of Claim No. 22 filed by Darryl Fish; (ii) Proof of Claim No. 25 filed by Dr. Alden; (iii) Proof of Claim No. 26 filed by Dr. Alden; (iv) Proof of Claim No. 27 filed by Private Connection Auto LLC; (v) Proof of Claim No. 28 filed by Private Connection Auto LLC; and (vi) Proof of Claim No. 29 filed by Crescent City Property Redevelopment Association, LLC.  The Court sustained in part and overruled in part Perry's objection to Proof of Claim No. 31, filed by Dr. Alden, and allowed a general unsecured claim against the estate in the amount of $6,700.   The Court further sustained in part and overruled in part Perry's objection to Proof of Claim No. 32, filed by Dr. Alden, and allowed a general unsecured claim against the estate in the amount of $12,000.   The Court also granted certain motions filed by Perry:  (i) *Motion To Terminate Joint Venture Agreements in Order To Trigger Sale Provisions and Motion for Accounting*, [No. 20-11986, ECF Doc. 79]; (ii) *Debtor's Motion To Avoid Quit Claim Deed*, [No. 20-11986, ECF Doc. 91]; and (iii) *Motion To Cancel Collateral*

---

[1]    Capitalized terms used herein refer to those terms and definitions used in the Court's Liability Opinion, [No. 20-11986, ECF Doc. 433; Adv. No. 21-1002, ECF Doc. 177; Adv. No. 21-1024, ECF Doc. 94].

*Mortgage*, [No. 20-11986, ECF Doc. 284].[2]  And the Court denied as moot the *Debtor's Motion To Reject Joint Venture Agreement on 9th Street as Executory Contract*, [No. 20-11986, ECF Doc. 97], and denied the *Motion for Relief from the Automatic Stay*, filed by Dr. Alden, [No. 20-11986, ECF Doc. 172].

The Court consolidated claims asserted in the Alden Creditors Adversary, [Adv. No. 21-1002], with the contested matters initiated by the objections to proofs of claim listed above, [No. 20-11986, ECF Doc. 231]; thus, the Court's rulings on those claim objections also resolved the claims asserted by the Alden Creditors in that adversary proceeding.  The Court further ruled in the Liability Opinion in favor of Perry on all counterclaims asserted by him in his Reconventional Demand, finding that Dr. Alden is liable to Perry for damages for (i) fraud committed under article 1953 of the Louisiana Civil Code and (ii) violation of the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUPCPL"), LA. REV. STAT. ANN. §§ 51:1401–1428.

The Court subsequently held a two-day evidentiary hearing on April 15 and April 16, 2024, solely on the quantum of damages that should be assessed, if any, against Dr. Alden and in favor of Perry for Dr. Alden's commission of fraud against Perry and his violations of the LUPCPL (the "Quantum Trial").  The Court considered testimony from the following witnesses: Dennis A.

---

[2]     In granting Perry's *Motion To Terminate Joint Venture Agreements in Order To Trigger Sale Provisions and Motion for Accounting*, this Court instructed the Subchapter V Trustee assigned to the case, in coordination with Debtor's counsel,

> (i)    to obtain independent appraisals of the Palm Drive Property, the Bonfouca Property, and the Sampson Property; (ii) within 30 days of this Order, file required pleadings to retain a real estate broker on behalf of the estate who will market and sell the properties within 120 days of the date of this Order; and (iii) seek final approval from this Court of the sale of each of the properties.  Proceeds from the sale of each property will be divided equally between Perry and Perry Associates, the counterparties to each joint venture agreement.

[No. 20-11986, ECF Doc. 433, at 53–55].  Any disputes regarding the division of proceeds will be handled by the Court separately and outside of the quantum findings in this Memorandum Opinion and Order.

Perry; Rebecca Ahysen; Gerard Reidling; John Eason; Gilberto Eyzaguirre; Ciera Jenkins; Michael Flash; Patrick Gros; and Darryl Fish. The parties stipulated at the Quantum Trial to the qualification of Patrick Gros as an expert in accounting and financial analysis. The Court admitted the following exhibits into evidence: Debtor Exhibits 1–13, 15–20, 23 (only pages actually presented on the record at trial), 26–27 (only pages actually presented on the record at trial) & 32–34, [Adv. No. 21-1002, ECF Doc. 255]; and Alden Exhibits 8–9, 13–15 & 18–19, [Adv. No. 21-1002, ECF Doc. 251]. At the close of evidence, the Court allowed the parties to submit post-trial briefing. [No. 20-11986, ECF Doc. 531; Adv. No. 21-1002, ECF Doc. 274; Adv. No. 21-1002, ECF Doc. 276]. The Court then took the issue of quantum under advisement. [No. 20-11986, ECF Doc. 536; Adv. No. 21-1002, ECF Doc. 276].

Pursuant to Federal Rules of Bankruptcy 9014 and 7052, the Court now makes the following findings of fact and conclusions of law:[3]

## JURISDICTION AND AUTHORITY

This Court has subject-matter jurisdiction over the instant matters pursuant to 28 U.S.C. § 1334 and the matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis pursuant to 28 U.S.C. § 157(b)(2).

## FINDINGS OF FACT

A.      **Specific Witness Credibility Determinations**

1.      The Court finds Perry to be a generally credible and earnest witness. He appeared to answer questions posed to him truthfully to the best of his recollection. The Court affords

---

[3]      To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

significant weight to Perry's testimony regarding (i) his business losses caused by Dr. Alden's fraudulent actions, (ii) litigation expenses related to disputes with Dr. Alden, and (iii) his own mental and emotional distress, suffering, and changes in quality of life.

2.      The Court finds the testimony of Rebecca Ahysen to be somewhat helpful to the extent that it corroborates Perry's testimony regarding mental and emotional distress, suffering, and changes in his quality of life.  The Court finds Ahysen's testimony as to lost profits or attorneys' fees to be unhelpful, however, as she testified that she was uninvolved with financial aspects of Perry's various business ventures and lawsuits.

3.      The Court finds the testimony of Gerard Reidling to be credible and helpful on the issue of Perry's emotional distress and mental anguish.  Much of Reidling's testimony lacked specific knowledge of the financial and legal troubles experienced by Perry; thus, the Court weighs that testimony accordingly.

4.      The Court finds the testimony of John Eason to be unhelpful as to the issue of damages.  Considering Eason's own legal disputes with Dr. Alden and/or Dr. Alden's spouse, the Court finds that Eason's testimony lacks objectivity.  The Court therefore gives no weight to Eason's testimony.

5.      The Court finds Gilberto Eyzaguirre to be a polite and earnest witness. Eyzaguirre's testimony was helpful to the extent it was based on firsthand knowledge of Perry's personality and demeanor over several decades, spanning before and after Perry's dealings with Dr. Alden; on the issue of Perry's emotional distress and mental anguish, the Court gives Eyzaguirre's testimony much weight.  The Court observes, however, that Eyzaguirre lacked specific knowledge of business transactions or legal disputes with Dr. Alden and the Court thus gives little weight to Eyzaguirre's testimony on the issue of business losses.

6.      The Court finds Perry's daughter, Ciera Jenkins, to be particularly helpful in determining quantum of damages for emotional distress and mental anguish due to the specificity of her testimony.  The Court affords significant weight to Jenkins' testimony.

7.      The Court finds the testimony of Michael Flash to be credible and helpful on the issue of damages for emotional distress and mental anguish.  The Court gives considerable weight to Flash's testimony.

8.      The Court finds the expert testimony of Patrick Gros to be credible on the issues of financial losses experienced by Perry as a result of Dr. Alden's fraudulent actions.  The Court gives much weight to Gros's testimony at trial in connection with his expert report.

9.      The Court finds Darryl Fish to be a pleasant, but unsophisticated witness.  Fish's testimony, however, generally did not relate to the issue of quantum before the Court. Accordingly, the Court gives no weight to Fish's testimony.

**B.      Perry's Evidence on Damages**

10.     This Quantum Opinion incorporates by reference all findings of fact and conclusions of law in the Liability Opinion.  [ECF Doc. 433].

11.     Perry alleges that he suffered injuries due to Dr. Alden's egregious, unethical, and fraudulent actions, including (i) loss of profits and/or excess business losses, (ii) incurrence of attorneys' fees and litigation costs, and (iii) infliction of severe psychological and emotional distress.

**Loss of profits and/or excess business**

12.     The Court finds that Dr. Alden's fraudulent transactions intentionally diverted Perry's resources and placed undue financial strain on Perry.  The Court finds that Perry suffered actual monetary losses as a result of Dr. Alden's actions.  Specifically, the Court finds that Dr.

Alden caused Perry to suffer (i) excess losses at Deals on Wheels in 2017; (ii) losses on automobile inventory due to forced sales or surrender of automobile inventory; (iii) lost rent on two immovable properties that Dr. Alden fraudulently encumbered; and (iv) payments to Dr. Alden on a debt that had already been satisfied.

*Excess losses at Deals on Wheels in 2017*

13.    Although Perry and Dr. Alden engaged in relatively small, one-off financial transactions between 2012 and 2015, [ECF Doc. 433, ¶¶ 9–23], the transactions leading to all of the disputes between Perry and Dr. Alden started in 2015 with the NextGear Promissory Note and the execution of the Collateral Mortgage, [ECF Doc. 422, ¶¶ 24–119].

14.    Perry's tax returns from 2014 through 2020 show an abnormally high loss in 2017 due to losses at Deals on Wheels. *See* Hr'g Rec'g 12:30–:31 (Apr. 15, 2024); Hr'g Rec'g 9:50–:52 (Apr. 16, 2024); Debtor Ex. 33. Gros and Perry attributed those excess losses to several factors:

      a.  Lack of working capital from real estate transactions due to fraudulent encumbrances by Dr. Alden;

      b.  Redirection of time and focus from Deals on Wheels to selling immovable properties to attempt to satisfy alleged debt owed to Dr. Alden; and

      c.  Financial pressure from Dr. Alden related to the payment of the NextGear Promissory Note secured by the Collateral Mortgage (which included Perry's personal residence as collateral).

*See* Hr'g Rec. 10:01–:03 (Apr. 15, 2024); Hr'g Rec'g 9:51–:54, 10:43–:45 (Apr. 16, 2024); Debtor Ex. 33.

15.    Gros testified that Perry was able to restabilize finances at Deals on Wheels by 2018. *See* Hr'g Rec'g 9:50–:51 (Apr. 16, 2024); Debtor Ex. 33. Thus, Perry asserts a damages claim against Dr. Alden for excess losses attributable to lack of liquidity in 2017 only. *See* Hr'g Rec'g 10:43 (Apr. 16, 2024); Debtor Ex. 33. Gros calculated the net loss of 2017 to be $235,928.00. *See* Hr'g Rec'g 9:46–11:30 (Apr. 16, 2024); Debtor Ex. 33. In contrast, the annual

average net loss for the years of 2014–2016 and 2018 was $45,882.00. *See* Hr'g Rec'g 9:46–11:30 (Apr. 16, 2024); Debtor Ex. 33. After subtracting the average loss for the years surrounding 2017 from the net loss experienced in 2017, Gros calculated the excess loss for 2017 to be $190,046. *See* Hr'g Rec'g 9:50–:51 (Apr. 16, 2024); Debtor Ex. 33. The Court accepts Gros' uncontroverted expert opinion.

16.     Accordingly, the Court finds that Perry suffered actual losses of **$190,046** in 2017 as a result of the fraud and violations of the LUPCPL committed by Dr. Alden.

*Losses due to forced sales and surrender of automobile inventory*

17.     Due to fraudulent encumbrances placed by Dr. Alden on Perry's immovable properties and pressure placed on Perry by Dr. Alden to pay alleged debts by preparing properties to be sold, Perry lost significant rental income, which were the primary source of funding of operations at Deals on Wheels during slow sales periods. *See* Hr'g Rec'g 9:58–10:00 (Apr. 16, 2024); Debtor Ex. 33. Without funds to subsidize operations, Perry could not service the debt obligations to NextGear. *See* Hr'g Rec'g 9:58–:59 (Apr. 16, 2024); Debtor Ex. 33. Perry was forced to liquidate or surrender twenty automobiles for below-market value. *See* Hr'g Rec'g 9:59–10:03 (Apr. 16, 2024); Debtor Ex. 33.

18.     Gros calculated the loss of each vehicle Perry sold or surrendered at a discount by subtracting the actual sale price of each vehicle from the upper limit of the "Fair Market Range" from the 2024 Kelley Blue Book for each vehicle's make and model, s*ee* Hr'g Rec'g 10:00–:03 (Apr. 16, 2024); Debtor Ex. 33. Gros acknowledged during his testimony that his analysis could have been more accurate if he had been able to obtain market values from 2019, the year of the sales, but testified that he had been unable to locate historical market values from that year. *See* Hr'g Rec'g 10:01–:02 (Apr. 16, 2024). That said, Gros also testified that, because used cars

depreciate over time, 2024 Kelly Blue Book valuations already reflect each vehicle's depreciation in years since 2019. *See* Hr'g Rec'g 10:00–:03 (Apr. 16, 2024). Dr. Alden presented no contradictory expert evidence. The Court accepts Gros' expert opinion and finds that Perry suffered a total loss of **$83,837** for the forced liquidation/surrendering of vehicles as a direct result of Dr. Alden's fraud and violations of the LUPCPL.

*Losses on fraudulently encumbered rental properties*

19.     Mr. Perry alleges that he lost rent on two properties, the 9th Street Property and the Westbank Expressway Lot, due to fraudulent encumbrances placed on each by Dr. Alden.

<u>The 9th Street Property</u>

20.     Under the First 9th St. Lease between Perry and Fish, Fish was required to pay to Perry a total of $975 per month in rent, comprised of cash payments of $350 and the cash equivalent of $600 in labor for renovations to the property. [ECF Doc. 433, ¶ 79]. Pursuant to this Court's Liability Opinion, this Court assessed damages against Fish and in favor of Perry in the amount of $8,735, representing $3,485 in stipulated rental arrears due under the First 9th St. Lease up to July 2018 plus 25 months of unpaid rent at $350 per month during Fish's continued occupancy of the 9th Street Property between July 2018 and September 2021. [ECF Doc. 433, at 39–41 & 59].

21.     This Court also found that, unbeknownst to Perry, Dr. Alden fraudulently executed the Second 9th St. Lease with Fish, thereby illegally encumbering the 9th Street Property beginning on September 1, 2019. [ECF Doc. 433, ¶¶ 90–107]. The Second 9th St. Lease required Fish to pay $875 per month directly to the mortgage holder, among other things. *See id.* No evidence is in the record indicating that those payments were made. In the Liability Opinion, the Court found that the Second 9th St. Lease was not a valid or enforceable contract due to fraud

perpetrated by Dr. Alden. *See id.* Perry initiated eviction proceedings against Fish in 2019, which is when he discovered the fraudulent Second 9th St. Lease. *See id.*

22.     Based on the evidence presented at the Quantum Trial, *see* Hr'g Rec'g 10:06–:07 (Apr. 16, 2024), Perry could have leased the 9th Street Property to a new renter in September 2019. What is not clear from the record is the amount of rent that a new renter would have been willing to pay to occupy the 9th Street Property. The Court finds the best evidence of the amount of monthly rent a new renter would have paid is the monthly cash rent owed under the First 9th St. Lease. Therefore, the Court finds that, due to his fraudulent acts perpetrated against Perry related to the Second 9th St. Lease, Dr. Alden is jointly and solidarily liable with Fish to Perry for damages in the total amount of **$8,400.00**, representing $350.00 per month for 24 months (September 2019 through and including September 2021 when Fish vacated the 9th Street Property).[4]

The Westbank Express Lot

23.     As documented in the Liability Opinion, Dr. Alden convinced Perry in August 2017 not to sell his unencumbered Westbank Expressway Lot to an interested buyer for $47,000, but rather, to grant a mortgage on that property in favor of Dr. Alden to serve as collateral for repayment of amounts purportedly owing to Dr. Alden plus a new loan of $10,000. [ECF Doc. 433, ¶¶ 50–60]. In May 2019, Dr. Alden forged and recorded in the public record the Westbank Expressway Quit Claim Deed dated September 2017 transferring Perry's Westbank Expressway Lot to Dr. Alden. *See id.* The Court finds that Dr. Alden unlawfully encumbered the Westbank

---

[4]     The Court does not find persuasive Gros' reliance on the rent owed under the Second 9th Street Property—a fraudulently executed document with terms exceedingly favorable to Dr. Alden, [ECF Doc. 433, ¶¶ 90–107]—as the basis for his analysis of lost rent on the 9th Street Property. Further, Gros' testimony and calculations regarding lost rent contained unexplained discrepancies revealed on cross-examination. *See* Hr'g Rec'g 10:51 (April 16, 2024). Thus, the Court declines to accept his analysis on the issue of lost rents on the 9th Street Property.

Expressway Lot from May 2019 through and including November 2023, the month this Court

issued its Liability Opinion, for a total of 54 months.[5]

24.     Perry testified that he was not able to sell or lease the Westbank Expressway Lot

with the unlawful encumbrance attached.  *See* Hr'g Rec'g 11:18–:19, 12:13–:19 (Apr. 15, 2024).

To calculate lost rents that Perry could have earned if he had leased the Westbank Expressway Lot

during those 54 months, Gros testified that he reached a value of $1,075 in monthly rent for the lot

using the average of rents on comparable properties given to him by a local realtor.  *See* Hr'g Rec'g

10:11–:13 (Apr. 16, 2024); Debtor Ex. 33.

25.     Dr. Alden presented no contradictory expert evidence.  The Court accepts Gros'

expert opinion on the amount of monthly rent Perry forfeited because Dr. Alden fraudulently

encumbered the Westbank Expressway Lot and finds that Perry suffered a total loss of **$58,050.**

*Perry's payments to Dr. Alden on a debt that had already been satisfied*

26.     In the Liability Opinion, the Court found that Perry paid and Dr. Alden received

$14,043.40 from Southern Title, Inc. at the closing of the sale of the Palm Drive Property,

representing funds paid by Perry to pay off the balance remaining on the debt owed to Dr. Alden

secured by the Collateral Mortgage.  [ECF Doc. 433, ¶¶ 17–42]; Debtor Ex. 33.  The Court further

found that Dr. Alden never released the Collateral Mortgage.  *See id.*

27.     Based on the uncontroverted evidence before it, the Court finds that Perry suffered

damages of **$14,043.40** based on Dr. Alden's fraud and refusal to cancel the Collateral Mortgage

upon satisfaction of the debt owed to him.

---

[5]     No evidence is in the record evidencing the date of cancellation of the forged Westbank Expressway
Quit Claim Deed from the public mortgage records.

### Attorneys' fees

28.      To defend various prepetition lawsuits against him, including the Alden Creditors

Adversary, Dr. Alden's Foreclosure Action, and suits by and against Fish, [No. 20-11986, ECF

Doc. 433, ¶¶ 137–138]; *see* Hr'g Rec'g 11:47–:48 (April 15, 2024), as well as to prosecute estate

causes of action in his bankruptcy case, Perry was required to employ legal counsel, including (i)

Robin De Leo & The De Leo Law Firm, (ii) Wayne Aufrecht, (iii) Mary DeVun, (iv) Riguer Silva,

(v) Sean Morrison, (vi) Don Bann, (vii) William Penton, and (viii) Sternberg, Naccari & White,

LLC.  Perry also incurred litigation costs as well, including costs paid to (i) Patrick Gros, CPA,

for accounting and litigation support services; (ii) Mary Ann Sherry of The Write Image, Inc.; (iii)

Adele Thonn of The Write Consultants; (iv) Serpas Court Reporting for transcription of a

deposition of the opposition's handwriting expert; (v) Acorn Transcripts; and (vi) the Clerk of the

22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana, for filing, recording,

and photocopying various documents necessary for the Liability Trial.  *See* Hr'g Rec'g 11:04–:16

(Apr. 15, 2024).  Based on the findings contained in the Liability Opinion, the Court concludes

that the Alden Creditors Adversary, Dr. Alden's Foreclosure Action or the lawsuit filed by Fish

against Perry to counter the eviction proceedings, *see* Hr'g Rec'g 11:47–:48 (April 15, 2024), were

filed in good faith, given the fraud and LUPCPL violations committed by Dr. Alden.

*Robin De Leo & The De Leo Law Firm*

29.      The Court admitted into evidence Debtor Exs. 1–6, consisting of fee applications

submitted pursuant to 11 U.S.C. §§ 327 and 330 (and ultimately approved by the Court on an

interim basis without objection) for services rendered in Perry's bankruptcy proceeding.  *See* Hr'g

Rec'g 10:33–:44 (Apr. 15, 2024).  After reviewing the services itemized in each exhibit, the Court

finds that Perry incurred expenses directly attributable to Dr. Alden's fraud and LUPCPL violations as follows:

  a)  The Court finds that **$4,487.70** of the $24,828.94 in fees and costs requested in the First De Leo Fee Application, *see* Debtor Ex. 1, for the period of December 1, 2020, through March 5, 2021, represents expenses incurred by Perry and attributable to harm caused by Dr. Alden. *See* Hr'g Rec'g 10:33–:36 (Apr. 15, 2024).

  b)  The Court finds that **$4,806** of the $14,812.10 in fees and costs requested in the Second De Leo Fee Application, *see* Debtor Ex. 2, for the period of March 17, 2021, through June 30, 2021, represents expenses incurred by Perry and attributable to harm caused by Dr. Alden. *See* Hr'g Rec'g 10:37–:39 (Apr. 15, 2024).

  c)  The Court finds that **$42,560.33** of the $51,108.92 in fees and costs requested in the Third De Leo Fee Application, *see* Debtor Ex. 3, for the period of July 1, 2021, through November 19, 2021, represents expenses incurred by Perry and attributable to harm caused by Dr. Alden. *See* Hr'g Rec'g 10:39–:40 (Apr. 15, 2024).

  d)  The Court finds that **$76,729.26** of the $91,403.26 in fees and costs requested in the Fourth De Leo Fee Application, *see* Debtor Ex. 4, for the period of November 19, 2021, through April 23, 2022, represents expenses incurred by Perry and attributable to harm caused by Dr. Alden. *See* Hr'g Rec'g 10:40–:41 (Apr. 15, 2024).

  e)  The Court finds that **$0.00** of the $5,545.38 in fees and costs requested in the Fifth De Leo Fee Application, *see* Debtor Ex. 5, for the period of May 9, 2022, through April 25, 2023, represents expenses incurred by Perry and attributable to harm caused by Dr. Alden. *See* Hr'g Rec'g 10:41–:42 (Apr. 15, 2024).

  f)  The Court finds that **$29,198** of the $38,606.19 in fees and costs requested in the Sixth De Leo Fee Application, *see* Debtor Ex. 6, for the period of May 3, 2023, through January 31, 2024, represents expenses incurred by Perry and attributable to harm caused by Dr. Alden. *See* Hr'g Rec'g 10:42–:44 (Apr. 15, 2024).

*Wayne Aufrecht*

31.  The Court admitted into evidence Debtor Ex. 7, a fee application submitted pursuant to 11 U.S.C. §§ 327 and 330 (and ultimately approved by the Court on an interim basis without objection) for services in connection with the main bankruptcy case and the Liability Trial for the period of October 20, 2021, through April 7, 2022. *See* Hr'g Rec'g 10:44–:46 (Apr. 15, 2024). Upon review of the services provided in Debtor Ex. 7, the Court finds that **$30,149** of the

$30,250.63 in reasonable fees are expenses incurred by Perry that are attributable to the harm caused by Dr. Alden.  *See* Debtor Ex. 7.

### *Mary DeVun*

32.     As found by this Court in the Liability Opinion, on April 4, 2019, Dr. Alden filed a Petition for Damages, for Executory Process, and for Suit on a Promissory Note in Louisiana state court on behalf of six closely held corporate entities against Perry, asserting claims to recover allegedly secured and unsecured debts purportedly owed by Perry and Deals on Wheels related to the transactions between them.  [ECF Doc. 433, ¶ 137].  That case was removed, referred to this Court, and consolidated with various contested matters stemming from Perry's objections to the Alden Entities' proofs of claim.  [ECF Doc. 433, ¶¶ 137 & 231].

33.     Perry retained Mary DeVun of The Law Offices of Juarez, DeVun and Associates, LLC, to represent him prepetition in the Alden Creditors Adversary.  Of the $1,850 invoiced by DeVun, Perry actually paid a total of $900.  *See* Hr'g Rec'g 10:49–:50 (Apr. 15, 2024). The Court finds that Perry's expenditure of **$900** is attributable to harm cause by Dr. Alden.

### *Riguer Silva*

34.     Perry paid a $60 consultation fee for prepetition legal advice regarding the Alden Creditors Adversary.   The Court finds that the full consultation fee of **$60** is attributable to harm cause by Dr. Alden.  *See* Hr'g Rec'g 10:50–:51 (Apr. 15, 2024); Debtor Ex. 9.

### *Sean Morrison*

35.     Perry retained Sean Morrison of Sean Morrison Law Offices LLC to represent him prepetition in the Alden Creditors Adversary.  Of the $2,652.76 invoiced by Morrison, Perry actually paid a total of $2,055.75 to Morrison for representation of him in the Alden Creditors Adversary, comprised of a $1,000 retainer fee plus $1,055.75 in fees and costs.  *See* Hr'g Rec'g

10:51–:54 (Apr. 15, 2024); Debtor Ex. 10.[6]   The Court finds that the expenditure of **$2,055.75** is attributable to harm caused by Dr. Alden.

### Don Bann

36.     Perry retained Don Bann of the Bann Law Firm for legal services associated with the Alden Creditors Adversary as well as Dr. Alden's Foreclosure Action.  The Court finds that Perry actually paid $9,050 in invoiced legal fees related to those matters.  *See* Hr'g Rec'g 10:54–:58 (Apr. 15, 2024); Debtor Ex. 11.  The Court further finds that **$9,050** is attributable to the harm caused by Dr. Alden.

### William Penton

37.     Perry retained William R. Penton III prepetition for legal services associated with a lawsuit brought by Fish against Perry in Jefferson Parish to counter Perry's eviction proceedings against Fish.  *See* Hr'g Rec'g 11:47–:48 (Apr. 15, 2024); Debtor Ex. 12.  The Court finds that Perry actually paid **$1,500** in invoiced legal fees (including a retainer fee) to William R. Penton, III for legal services associated with that lawsuit.  [Debtor Ex. 12].  The Court finds that the expense is attributable to Dr. Alden, who fraudulently entered into the lease on Perry's behalf. [No. 20-11986, ECF Doc. 433, ¶¶ 76–107].

### Sternberg, Naccari & White, LLC

38.     Perry retained Sternberg, Naccari & White, LLC ("Sternberg") to represent him prepetition in both the Alden Creditors Adversary and Dr. Alden's Foreclosure Action.  Of the $8,523.65 invoiced by Sternberg for legal fees and costs, Perry actually paid $8,000.00.  *See* Hr'g

---

[6]     Perry testified that he paid an additional $1,000 to Sean Morrison for a total of $3,055.75.  *See* Hr'g Rec'g 10:54.  The Court finds that the $1,000 check that was marked as "Received 11/15/2019," is included in Morrison's December 2, 2019 invoice as "Payment (12/02/2019) -$1,055.75."  Debtor Ex. 10.  The Court interprets the notation on the invoice to mean that payments received *as of* December 2, 2019, totaled $1,055.75; not that a payment of $1,055.75 was received *on* December 2, 2019.

Rec'g 10:59–11:04 (Apr. 15, 2024); Debtor Ex. 13. The Court finds that Perry's expenditure of **$8,000** is attributable to the harm caused by Dr. Alden.[7]

**Litigation costs**

*Patrick Gros*

39.     Perry retained Gros for accounting and litigation support services and paid Gros $7,450 for those services. *See* Hr'g Rec'g 11:04–:06 (Apr. 15, 2024); Debtor Ex. 15. The Court finds that Perry's expenditure of **$7,450** is attributable to the harm caused by Dr. Alden.

*Mary Ann Sherry of The Write Image, Inc.*

40.     Perry retained Mary Ann Sherry, CDE, of The Write Image, Inc. for forensic review of documents in connection with the Liability Trial and paid Sherry $875 for those services. *See* Hr'g Rec'g 11:06–:08 (Apr. 15, 2024); Debtor Ex. 16. The Court finds that Perry's expenditure of **$875** is attributable to the harm caused by Dr. Alden.

*Adele Thonn of The Write Consultants*

41.     Perry retained Adele Thonn of The Write Consultants for forensic review of documents and expert testimony in connection with the Liability Trial and paid Thonn $4,812.50 for those services. *See* Hr'g Rec'g 11:08–:10 (Apr. 15, 2024); Debtor Ex. 17. The Court finds that Perry's expenditure of **$4,812.50** is attributable to the harm caused by Dr. Alden.

*Serpas Court Reporting*

42.     Perry paid the entirety of $607 invoiced by Serpas Court Reporting for transcription of the deposition of Susan Abbey, Dr. Alden's handwriting expert at the Liability Trial. *See* Hr'g

---

[7]     Perry testified that he paid an additional $1,500 to Sternberg as a retainer fee, *see* Hr'g Rec'g 11:00; but the record contains no corroboration of his testimony.

Rec'g 11:10–:11 (Apr. 15, 2024); Debtor Ex. 18. The Court finds that Perry's expenditure of **$607** is attributable to the harm caused by Dr. Alden.

*Acorn Transcripts, LLC*

43. Perry paid the entirety of $3,226.50 invoiced by Acorn Transcripts, LLC for an 884-page transcription of the Liability Trial. *See* Hr'g Rec'g 11:11–:12 (Apr. 15, 2024); Debtor Ex. 19. The Court finds that Perry's expenditure of **$3,226.50** is attributable to the harm caused by Dr. Alden.

*St. Tammany Parish Clerk of Court*

44. Perry paid $908.92 to the St. Tammany Parish Clerk of Court in fees for filing, recording, photocopying, and/or certifying documents in connection with litigating the Alden Creditors Adversary and preparing for the Liability Trial. *See* Hr'g Rec'g 11:12–:15 (Apr. 15, 2024); Debtor Ex. 20. The Court finds that Perry's expenditure of **$908.92** is attributable to the harm caused by Dr. Alden.

**Emotional Distress**

45. Based upon the testimony provided by Perry, his long-term partner, his daughter, and other friends and family, Perry suffered from severe psychological and mental distress due to Dr. Alden's fraudulent actions. *See* Hr'g Rec'g 9:57–14:07 (Apr. 15, 2024). As a result of having to finance multiple fraudulent lawsuits against him, including a foreclosure action against his home, Perry testified that he experienced extreme stress, sleeplessness, and worry, developed a drinking habit, and expressed suicidal ideation to close friends and family. *See* Hr'g Rec'g 2:10, 3:38–:40, 3:52; 10:04–:06 (Apr. 15, 2024). The Court notes the distressing quality of the poem written by Perry on January 4, 2019, stating that he views life as "nothing but sorrow" and that he

is "not scared at all for death, [which he] welcome[s] once and for all." *See* Hr'g Rec'g 10:31–:33 (Apr. 15, 2024); Debtor Ex. 32.

46.     Perry testified that Dr. Alden's actions put him through "eight years of pure hell and misery." Hr'g Rec'g 10:04–:06 (Apr. 15, 2024). Perry testified that he worried he and his family would "lose everything." *See* Hr'g Rec'g 10:04–:05 (Apr. 15, 2024).

47.     Several friends and family members described Perry's stark change in demeanor from happy-go-lucky to severely depressed. *See* Hr'g Rec'g 3:35, 3:50 (Apr. 15, 2024). Perry's long-term partner, Rebecca Alwhen, testified that when she first met Perry he was loving, happy, and outgoing. *See* Hr'g Rec'g 2:08 (Apr. 15, 2024). After Dr. Alden sued Perry in 2019, she testified that he became withdrawn, depressed, and his whole demeanor changed. *See* Hr'g Rec'g 2:08–:11 (Apr. 15, 2024). Alwhen testified that she attributes Perry's change in demeanor to Alden's dealings with him. *See* Hr'g Rec'g 2:11–:12 (Apr. 15, 2025).

48.     Perry's longtime friend, Gerard Reidling, testified that Perry used to be a happy person. *See* Hr'g Rec'g 2:29–:30 (Apr. 15, 2025). When Reidling reconnected with Perry in 2018 at Deals on Wheels, he noticed that Perry was depressed and suffering. *See* Hr'g Rec'g 2:30–:33 (Apr. 15, 2025). Reidling attributed Perry's change to the interactions and litigation with Dr. Alden. *See* Hr'g Rec'g 2:34 (Apr. 15, 2025).

49.     Perry's uncle, Gilberto Eyzaguirre, testified that the time spent on defending litigation and pressure by Dr. Alden fractured Perry's interpersonal relationships. *See* Hr'g Rec'g 3:25–:26, 3:36–:37 (Apr. 15, 2024). Eyzaguirre testified that Perry had a great sense of humor over the years, he was emotionally well-balanced, and had a great relationship with his mother and children. *See* Hr'g Rec'g 3:23 (Apr. 15, 2024). But after problems with Dr. Alden began,

Eyzaguirre testified that Perry lost his sense of humor, he was emotionally stressed, and he stopped interacting with his family. *See* Hr'g Rec'g 3:25–:26 (Apr. 15, 2024).

50. Perry's relationship with his daughter, Cierra Jenkins, was particularly strained by the all-consuming nature of the fraudulent schemes and legal actions initiated by Dr. Alden against Perry. *See* Hr'g Rec'g 3:35–:39 (Apr. 15, 2024). Jenkins testified that the two were very close before the problems with Dr. Alden began, and Perry was a generally positive person. *See* Hr'g Rec'g 3:31–:33 (Apr. 15, 2024). But when Dr. Alden initiated litigation against Perry, Jenkins testified that Perry not only devoted all of his energy to defend himself, but his mood and demeanor darkened, which affected his relationship with her. *See* Hr'g Rec'g 3:35–:36 (Apr. 15, 2024). Jenkins testified that Perry called her on one occasion and told her he did not want to live anymore. *See* Hr'g Rec'g 3:39–:40 (Apr. 15, 2024). Jenkins testified that she attributes the change in his demeanor to the threat of losing everything for which he had worked his entire life. *See* Hr'g Rec'g 3:38 (Apr. 15, 2024).

51. Michael Flash, Perry's longtime friend of 33 years, testified that Perry was a happy-go-lucky person. *See* Hr'g Rec'g 3:50 (Apr. 15, 2024). Flash testified that he noticed a "big change" in Perry after the legal battles with Dr. Alden began. *See* Hr'g Rec'g 3:53–:54 (Apr. 15, 2024). Flash testified that Perry called him and told him that he "did not think he wanted to be alive anymore." *See* Hr'g Rec'g 3:52–:53 (Apr. 15, 2024). Flash encouraged him to seek mental health counseling or other therapy to deal with his stress. *See* Hr'g Rec'g 3:58–:59 (Apr. 15, 2024).

52. Based on the uncontroverted evidence, the Court finds that Perry suffered very real emotional distress and mental anguish attributable to Dr. Alden's fraud and LUPCPL violations.

## CONCLUSIONS OF LAW

### A.     Damages Allowed Under LUPCPL

In his Reconventional Demand, Perry asserted a claim for damages under the LUPCPL. [Adv. No. 21-1002, ECF Doc. 20].[8]  In its Liability Opinion, this Court found Dr. Alden liable to Perry under LUPCPL.  [ECF Doc. 433, at 57–59].  "[The LUPCPL] provides a private right of action to any person injured by 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'"  *Express Lien, Inc. v. Handle, Inc*., No. 19-10156, 2021 WL 2537032, at *3 (E.D. La. June 21, 2021).

Under LUPCPL, a plaintiff may recover "actual damages" for violations of the statute and "[i]n the event that damages are awarded . . . the court **shall** award to the person bringing such action reasonable attorney fees and costs."  LA. REV. STAT. ANN. § 51:1409(A) (emphasis added).  "Actual damages" that may be recovered for violation of the LUPCPL may include damages for mental anguish and humiliation.  *See Volentine v. Raeford Farms of La., LLC*, 201 So. 3d 325, 353 (La. App. 2d Cir. 2016); *Laurents v. La. Mobile Homes, Inc*., 689 So. 2d 536, 542 (La. App. 3 Cir. 1997).  "Expert testimony is not required to prove mental anguish damages."  *Laurents*, 689 So. 2d at 543.  "Vast discretion is accorded the trier of fact in fixing general damage awards."  *Volentine*, 201 So. 3d at 354; *see also Vadie v. Miss. State Univ*., 218 F.3d 365, 376 (5th Cir. 2000).

---

[8]     In his amended Reconventional Demand for Judgment and Damages, Perry requested declaratory judgments on the Collateral Mortgage, Westbank Expressway Lot Quitclaim Deed, the Procuration, and joint venture agreements.  [Adv. No. 21-1002, ECF Doc. 20, ¶¶ 82–84].  Perry also asserted state law causes of action for fraud, forgery, fraudulent misrepresentation, breach of fiduciary duty, fraudulent transfer, and unjust enrichment, although the Reconventional Demand references no specific Louisiana statutes.  [Adv. No. 21-1002, ECF Doc. 20, ¶¶ 85–104].  Perry asserted a claim for damages, referencing only the LUPCPL as the basis for any award of damages. [Adv. No. 21-1002, ECF Doc. 20, ¶¶ 105–109].

**B.      Dr. Alden Is Liable To Perry for Damages in the Total Amount of $586,752.36 for Violations of LUPCPL.**

Given the findings of fact herein and the Liability Opinion, in which this Court found that Dr. Alden's egregious, unethical, and fraudulent conduct toward Perry constituted violations of the LUPCPL, the Court concludes that Dr. Alden is personally liable to Perry under the LUPCPL as follows:[9]

For loss of profits and/or excess losses on multiple business ventures, Dr. Alden is liable to Perry for damages in the amount of **$354,376.40**.

For infliction of severe psychological and emotional distress, Dr. Alden is liable to Perry for damages in the modest amount of **$5,000**.  The amount of that award in no way diminishes the severity of the effect that Dr. Alden's actions have had on Perry's wellbeing.  The testimony of family and friends corroborated Perry's own testimony regarding the emotional distress and suicidal ideation he suffered; however, the record shows that Perry did not seek medical help or receive medical attention for emotional problems.  *Compare Laurents*, 689 So. 2d at 542–43 (awarding $2,000 for emotional distress to a couple living in unsuitable quarters who paid for expedited delivery of a mobile home built to certain specification but received an unlivable mobile home and dealer took no responsibility absent litigation), *with Volentine*, 201 So.3d at 354 (awarding $250,000 each to husband and wife for emotional trauma suffered by the permanent loss of family farm that provided their livelihood and had been held in the family for generations);

---

[9]      Under the LUPCPL, "[i]f the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained." LA. REV. STAT. ANN. § 51:1409(A).  Perry is not eligible for an award of treble damages under LUPCPL as there are no allegations or evidence that Dr. Alden's violations of LUPCPL occurred after he was placed on notice by the Louisiana Attorney General.  *See Del. Valley Fish Co. v. 3South LLC*, 601 F. Supp. 3d 7, 27 (M.D. La. 2022).

*see also Vadie*, 218 F. 3d at 377 (discussing evidence sufficient to support damages for emotional distress in the context of an employment discrimination action).

Because this Court has awarded general damages for violation of the LUPTCL, the Court is required to award reasonable attorneys' fees and costs. *See* LA. REV. STAT. ANN. § 51:1409(A); *Laurents*, 689 So. 2d at 543. The Court finds that Dr. Alden is liable to Perry for attorneys' fees in the amount of **$209,496.04** and costs in the amount of **$17,879.92** for violations of LUPCPL.

## CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Dr. William Alden is liable to Dennis Perry for damages for violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, LA. REV. STAT. ANN. §§ 51:1401–1428, in the total amount of **$586,752.36**.[10]

**IT IS ORDERED** that the damages award against Dr. William Alden in the amount of **$586,752.36** shall be payable by Dr. William Alden to Dennis Perry within sixty days of this Order by mailing via commercial courier or hand-delivering certified funds to Perry's bankruptcy counsel at the address listed below or by wire transfer of funds according to instructions provided by Perry's bankruptcy counsel.

**Robin De Leo**
800 Ramon Street
Mandeville, Louisiana 70448

**IT IS FURTHER ORDERED** that the Court grants post-judgment interest to Perry and the rate that will be in effect on the date of the entry of the judgment will be 4.19% per annum. *See* 28 U.S.C. § 1961(a); *Ocasek v. Manville Corp. Asbestos Disease Comp. Fund*, 956 F.2d 152, 154 (7th Cir. 1992); *Pereira v. Goldberger (In re Stephen Douglas, Ltd.)*, 174 B.R. 16, 22 (Bankr.

---

[10] Dr. Alden is jointly and severally liable with Darryl Fish for $8,400 of $586,752.36 in damages. *See supra* ¶¶ 19–21; [ECF Doc. 433, at 39–41 & 59].

E.D.N.Y. 1994) ("Post-judgment interest need not be specifically requested; it is mandated by federal statute.  Federal law governs whether post-judgment interest is awarded on a federal court judgment in an action otherwise governed by state law.") (citing *Pester Ref. Co. v. Ethyl Corp. (In re Pester Ref. Co.)*, 964 F.2d 842, 849 (8th Cir. 1992)).[11]

**IT IS FURTHER ORDERED** that this Court's award of post-judgment interest will accrue during the period from the date the judgment is rendered until the date the judgment is satisfied.  *See La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 331–32 (5th Cir. 1995).

**IT IS FURTHER ORDERED** that a separate judgment shall be entered consistent with the findings of fact and conclusions of law herein.

**IT IS FURTHER ORDERED** that the Court will hold a hearing on **Thursday, April 3, 2025, at 10:00 a.m. IN PERSON** at the United States Bankruptcy Court, 500 Poydras Street, Courtroom B-709, New Orleans, Louisiana 70130 to assess compliance with this Order and, in the event of non-compliance, to assess whether additional action should be taken by the Court to ensure compliance with this Order.

**IT IS FURTHER ORDERED** that counsel for Perry shall serve this Order via first-class U.S. Mail on the required parties who will not receive a copy through the Court's CM/ECF system pursuant to the Federal Rules of Bankruptcy Procedure and this Court's Local Rules and file a certificate of service to that effect within three (3) days.

New Orleans, Louisiana, January 28, 2025.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

[11]     By statute, the interest is set at the rate of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961(a).